The next case is Joseph v. Buffalo News. Good morning. May it please the Court. My name is Joel Joseph. I'm arguing this case pro se. I'm a writer, besides being a lawyer. I write books and articles to supplement my Social Security income. I regularly submit articles to newspapers across the United States. When newspapers agree to publish an article, except for the Buffalo News, they pay for it. The Buffalo News published one of my op-eds titled Manufacturing Tax of Zero in its newspaper in print, and then they published it online for more than six months. They published it online without my consent. The Buffalo News refused to pay me anything for either the publication in print or online. I obtained a copyright from the United States Copyright Office on this article. The district court erroneously ruled that my article was authorized by Ticini v. New York Times to be published without payment. Ticini ruled to the contrary. The Supreme Court ruled in Ticini that electronic publishing of an article must be expressly authorized. I did not authorize the electronic publishing of the article. I agreed only that the article could be published in print. No price term. You're no longer concerned about the print publication? I am concerned about it. No price term was agreed to, and I believe that there was no meeting of the minds under contract law and that a reasonable price could be implied. But zero is not a reasonable price by any person's definition. The district court found that I authorized the Buffalo News to publish in print without payment. This is clearly erroneous. The court stated to folks that submit letters to the editor, expect to be paid for their letters to the editor to be published. It's not a letter to the editor. I didn't say that. I've asked you a question. No. Letters to the editor you don't expect payment for. How about opinion pieces? Can someone submit an opinion piece so they, by the simple fact they submit it, they expect to be paid? Yes. I think they can authorize you to publish it without payment, but if not, you can't. Did you indicate that if they published it, they would owe you money? No, I did not. Why wouldn't you do that? I submit. Wouldn't you want them to know that you were expecting to be paid if they published it? I think it's pretty obvious. I ran a book. No, I don't think it is obvious. You're arguing here right now about it. Well, every other newspaper does pay me and has paid me. I ran a book publishing company for 10 years, and if somebody sent me a submission for a book. Well, books might be different. But what was it about your letter that put them on notice that you expected to be paid? It wasn't a letter. Oh, the submission that you made. The submission. It's traditional to make submissions. You're saying it's an industry standard? It is an industry standard. The New York — I've been published in the New York Times. The standard is that they pay you $150 when it's published, unless you have some other express terms. I submitted an op-ed to the New York Times. They said we agreed to publish it, and they made a few editorial changes, and they paid me. I wrote op-eds for USA Today the same way, sent them an article. They published it, and they paid me. This is the only news — I've been published in 300 and some newspapers across the country, and this is — What's the range of payment that you've received? The payment ranges from $50 to $150. And what were the damages that you asked for this? Well, I sought statutory damages. No, no, no. With regard — not the digital publishing, but the publishing in print. Well, I had asked for statutory damages, but at this point I understand that I'm entitled to actual damages. Okay. So actual damages would be approximately $150 for that. Approximately. Maybe $100. Did you even talk to the Buffalo paper about that before you came here today? Of course I did. All right. If they would have said we'll pay you that — Less than the cost of an airline ticket, I suspect, from Buffalo International to LaGuardia or JFK. But in any event, go ahead. If they would have agreed to pay me $100 back when it ran, it would have been fine for the print edition. No mention was made anywhere of the electronic publication. Did they continue to publish electronically after you objected to any publication at all without payment? Yes, they did, for more than six months. The Buffalo News argued that it was a letter to the editor, and I've said that it clearly wasn't. It's a longer — it's longer than a letter to the editor. And they published in the newspaper that it was special to the news and not — it wasn't listed as a letter to the editor. I moved for a motion to leave to amend, and that was denied. And I believe it should have been granted under Foman v. Davis and Connolly v. Gibson. The district court also refused to allow me to file a cert reply. I believe this Court should reverse the ruling of the district court and order the complaint be reinstated with leave to amend and rule that my copyright was violation — violated by publication in print and online. The rights of authors must be protected. The Constitution of the United States, at Article I, Section 8, Clause 8, provides that Congress has the power to enact legislation to promote the progress of science and the useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings. My writings have not been protected. I should be paid. Maybe I should have been paid $100, but I should have been paid. Pursuant to the Constitution, the Congress passed the Copyright Act protecting my rights, and I just seek that my rights be protected. Thank you. May it please the Court. Heath Simzak, Bonshenik and King for Defendant Appellee, The Buffalo News. As the district court properly noted, the only issue really in this case is whether or not the plaintiff had in his complaint or in his proposed amended complaint alleged that The Buffalo News had copied his article, letter, whatever you want to call it, without authorization. If you look at the four corners of the complaint or the proposed amended complaint, it doesn't expressly say that there was no authorization, only that he wasn't paid. Now, when you look at the complaint, it references communications between The Buffalo News and the plaintiff that refers to really a string of e-mails that represents the entire transaction between them. And at the end of that string of e-mails, after The Buffalo News has said, looks like we'll put it in the paper, he responded, great, thanks. Absolutely, Your Honor. This is a very succinct, clear, very simple set of facts. But could you focus in, you can return to the in-print edition, but don't you have an issue with the electronic publication? Well, Your Honor, the grant of authority that we received had no restrictions. There was no mention of payment, no payment requirement. There was no restriction in terms of how it could be published, whether it was restricted to print or online, website. To see the case that plaintiff relies on is factually different. That case involved a print publisher who had license agreements with specific freelance writers, a group of them, around 21 of them. But then the print paper turned around and licensed those articles to Nexus Lexis, a third-party database. Here we have authorization by plaintiff to The Buffalo News to publish, and The Buffalo News published. That's it. It had the authority. As you noted, the initial submission of the article to The Buffalo News creates an implied license. That alone, I think, would have authorized the use of the article. Here we have not only that, but we have the express statement, The Buffalo News saying, Mr. Joseph, we intend to publish your article. And Mr. Joseph responding, great, thanks, without any restriction or requirement whatsoever. Isn't that ambiguous? I don't fault you for interpreting it as being an authorization, but then after you published it in print and started publishing it electronically and he says, whoa, you've got to pay me, I don't understand why at that point you wouldn't just pull the electronic publication, because he didn't expressly say this is an authorization to publish without payment. When a dispute did come up, Your Honor. What's that? When a dispute did come up, when this issue was raised, a plaintiff did request payment. Our response to him was, would you like us to remove your article from the website? Your Honor? No response. So there was no response to that whatsoever. And there was never a specific objection to the fact that there was a print publication and a website publication. Website publication never came up until the proposed amended complaint. There was never a specific objection to the fact that it was. You offered to remove it from the website and he didn't. He did not respond to it at all. And that's in the record at 66-1SA-31 at the bottom of that page. So very simply, we have a very simple, very succinct, you look at those e-mails, you have the original submission, you have the express written authorization saying we can use it. And contrary to what the plaintiff says, there doesn't have to be a written contract or an agreement to express payment terms, et cetera, a formation of a formal contract for there to be a non-exclusive license and permission to use it. Here we have a very simple set of facts. As the plaintiff has said, he's an experienced lawyer, he's an experienced publisher. It would have been a very, very simple thing to say when we asked, we're going to publish your article for him to just say, great, thanks, but it's going to cost you X number of dollars. It would have been extremely simple. That wasn't done. It was completely reasonable and within the permission granted for the Buffalo News to publish the article. For that reason, we'd ask for you to affirm. I never authorized the electronic publication, and I was never asked if they should stop. The electronic publication was just their digital version of the paper, right? That's right. I'm from Rochester area, so I get the Democrat and Chronicle, and in the morning I get the print version, and then there's also a digital version. So it wasn't like the Cassini case where they licensed it out to a third party. This was just the digital side of the Buffalo Evening News, right? No, it's not quite the same because it stayed up online for more than the day of publication. It stayed up, I don't know exactly, but for more than 180 days. What are your damages for the digital? Well, the digital one, I would definitely seek statutory damages, and I'm entitled to it under the Copyright Act of 1976. So I would ask the jury. I would seek up to $150,000 for that. Okay. What do you say about your adversary said that they offered to you, that they sent you an e-mail saying, do you want us to remove it from the digital? You didn't answer that. I did not. I don't recall getting that. I never authorized them to do it. You don't recall, but you're asserting that there was no such e-mail? I am asserting that, yes. It's certainly a factual question. It's never been raised before that I authorized it by not responding to an e-mail. That's not — I don't think that's fully in the record. How about to get statutory damages? The statute says the copyright must be registered no later than three months after the work's first publication or within one month of learning of the infringement. And it doesn't seem like you meet that condition. I meet that for the electronic publication because they kept publishing it, as I said, for more than six months. I did not meet it for the print edition. So you agree that your copyright claim for the print edition is no good? No. It's only good for actual damages. Huh? Only good for actual damages. What were the actual damages that you alleged in your complaint? Well, the actual damages that I just said to the court, the article, I would have been paid approximately $100 to $150. So I'm conceding that I only get actual damages for the print violation, but for the electronic publication. You want to go and try this case up in Buffalo and ask a jury in Buffalo to give you $150,000 on a claim that you'd take $100 for the value of your work? Yes, because I believe — That'll really supplement your Social Security. It would. It would. I'm not sure the jury would give me $150,000. I suspect they wouldn't. But I would think the people of Buffalo would expect to get paid for their work. Yeah, you're right. Thank you very much. I appreciate it. Mr. Armitage, may I ask the Journals Council once again to tell me where I find — how do I find in the record your email offering to remove it from the — Absolutely, Judge LaValle. It's at — it's document 66-1. Oh, document 66-1. It's a supplemental appendix, page 31. And it's a email dated October 19, 2015, at 11.09 a.m. from John Neville of the Buffalo News, indicating, because you weren't paid, I will remove your column from the news's website if you want. And there was no response to that. Thank you both. The last two cases are on submission, so I will ask the clerk to adjourn court. Court is adjourned.